UNIGARD SECURITY INSURANCE COMPANY and
Employers Surplus Lines Insurance Company, Appellants *v.*
MURPHY OIL USA, INC., Appellee *v.*
Associated International Insurance Company, Cross–appellee
*v.* Lloyd's of London, Cross–appellee *v.*
Century Indemnity Company, Cross–appellee

96–843                                           962 S.W.2d 735

Supreme Court of Arkansas
Opinion delivered January 29, 1998

[Petition for rehearing denied March 5, 1998.*]

---

\* GLAZE and CORBIN, JJ., not participating.

*Williams & Anderson*, by: *Leon Holmes*, for appellant Unigard Security Insurance Company.

*James, Yeatman & Carter, P.L.C.*, by: *Daniel R. Carter*, for appellant Employers Surplus Lines Insurance Company; *Rogers, Towers, Bailey, Jones & Gay*, by: *G. Kenneth Norrie* and *Kurt H. Dunkle*; and *Christie, Pabarue, Mortensen and Young, A Professional Corporation*, by: *James W. Christie*, of counsel.

*James E. Baine,* Murphy Oil USA, Inc.; *Compton, Prewett, Thomas & Hickey,* by: *Robert C. Compton;* and *Wright, Lindsey & Jennings,* by: *M. Samuel Jones III* and *Claire Shows Hancock,* for appellee.

*Shackleford, Phillips, Wineland & Ratcliff, P.A.,* by: *Teresa Wineland,* for cross-appellee Associated International Insurance Company.

*Phelps Dunbar, L.L.P.,* by: *George B. Hall, Jr.;* and *Bridges, Young, Matthews & Drake PLC,* by: *Stephen A. Matthews,* for cross-appellee Cheshire and Companies (styled and referred to in cross-appeal as Lloyd's of London).

*White and Williams,* by: *E. Douglas Sederhold, Susan Dignam Coletsky,* and *Frank J. Perch III;* and *Griffin, Rainwater & Draper, P.A.,* by: *Paul S. Rainwater,* for cross-appellee Century Indemnity Company.

DAVID NEWBERN, Justice. This is an insurance-coverage case. Murphy Oil USA, Inc., the appellee, filed suit in Union County against a number of its insurance carriers seeking a declaration that the carriers were obligated under certain general comprehensive liability ("CGL") policies to indemnify Murphy Oil for a judgment for compensatory and punitive damages previously rendered against it in a federal district court in Alabama. Prior to trial in Union County, certain insurance carriers settled with Murphy Oil, and others, such as Lloyd's of London and Century Indemnity Company (formerly California Union Insurance Company), won summary judgment and were dismissed from the case. The Union County jury returned a verdict in Murphy Oil's favor on its indemnification claims against appellants Unigard Security Insurance Company and Employers Surplus Lines Insurance Company ("ESLIC") but found against Murphy Oil on its indemnification claim against Associated International Insurance Company. Murphy Oil's motion for new trial as to Associated was denied.

The Trial Court entered judgment against Unigard and ESLIC for the amount that Murphy Oil had paid, with interest, in satisfaction of the underlying Alabama judgment, less the amounts that Murphy Oil had received through settlements with other

insurance carriers, plus a statutory penalty and prejudgment interest. The Trial Court ruled that Unigard and ESLIC would be "jointly and severally" liable for a total judgment of $5,997,411.96. Unigard and ESLIC now appeal from the judgment rendered against them. Murphy Oil brings a cross-appeal against Unigard and ESLIC and "contingent" cross-appeals against Associated, Century, and Lloyd's. Associated and Century bring contingent cross-appeals against Murphy Oil.

The parties raise numerous points on appeal. One point is entirely dispositive, however, and that is the threshold question whether the policies issued by the insurance carriers cover the liability that Murphy Oil incurred in the underlying Alabama suit. We hold that none of the policies involved in this case covers Murphy Oil's liability, and thus we reverse the judgment against Unigard and ESLIC and dismiss. We affirm on all cross-appeals. As we dispose of the case on the issue of coverage, it will be unnecessary to discuss or resolve the parties' other arguments.

In 1961, Murphy Oil entered into a lease of an island in the Mobile River in Alabama for the purpose of operating a petroleum-storage facility on the island. The island was owned by the Blakely Corporation. During Murphy Oil's operations on the island, petroleum products routinely spilled onto the land in connection with the cleaning and maintenance of the storage tanks and the loading of petroleum into transport vehicles.

In addition, three "major spills" of petroleum products occurred at Murphy Oil's facility on the island in 1970, 1975, and 1982. The first of these major spills occurred on April 13, 1970, when the facility was receiving a gasoline shipment from a barge stationed at the dock. Murphy Oil personnel had overestimated the capacity of the tank into which the gasoline was being pumped, and some 8,800 to 23,000 gallons of gasoline spilled through the tank's ventilation vents into the sandy, porous earth. The second major spill occurred on April 11, 1975. Some 22,000 to 26,000 gallons of gasoline leaked into the soil through a valve that was accidentally left open. The third major spill occurred on October 25, 1982. Some 4,600 gallons of diesel fuel seeped into the earth through a hole in the bottom of the tank, which had corroded.

Murphy Oil ceased operations on the island in 1983, and it returned possession of the island to the Blakely Corporation on September 30, 1985. Prior to the termination of the lease, Murphy Oil neither tested the island for possible contamination from the petroleum spills nor engaged in any clean-up efforts. Moreover, Murphy Oil did not inform the Blakely Corporation of the spills that had occurred during the lease term.

In October 1989, the Blakely Corporation learned that the island was in fact contaminated with petroleum products. The Blakely Corporation notified Murphy Oil, which refused to assist in the clean-up of the property and maintained that it had returned the island to the Blakely Corporation in good condition and that conditions on the island had deteriorated after Murphy Oil had vacated the premises.

The Blakely Corporation ultimately filed suit against Murphy Oil in April 1990 in the United States District Court for the Southern District of Alabama. It sought compensatory and punitive damages and alleged a number of causes of action against Murphy Oil, including ones for negligence, breach of lease, and trespass. The negligence claim alleged that Murphy Oil had "failed to use reasonable care to prevent the disposal, discharge and/or release" of the petroleum products and was thus negligent in its "use, operation and/or occupation of the leased premises." The negligence claim was dismissed, however, under the applicable statute of limitations and was not submitted to the jury.

In its breach-of-lease claim, the Blakely Corporation alleged that Murphy Oil had breached its lease in the following respects:

(a) By constructing and operating the facilities so as to cause or allow petroleum products and other pollutants to be discharged and/or remain on the property.

(b) By failing to surrender the premises in the same condition the premises were in at the commencement of the term of the Lease.

The breach-of-lease claim was based on a provision in the lease that required Murphy Oil, at the expiration of the lease term, to "quit and surrender the premises hereby demised in as good state and condition as reasonable usage thereof will permit."

Finally, the theory of the Blakely Corporation's trespass claim was that Murphy Oil, by leaving contaminants in the ground after vacating the premises, had interfered with its rights in the property.

During the Alabama trial, evidence was introduced revealing the extent of the petroleum contamination of the soil and groundwater on the island. Expert testimony indicated that the cost of removing the contamination would be $3.4 million.

The Alabama jury was instructed on the breach-of-lease and trespass claims and on the prerequisites for awarding punitive damages. With respect to the breach-of-lease claim, the jury was given the following instructions:

> . . . the Plaintiffs [Blakely Corporation] have sued the Defendant [Murphy Oil] for breach of contract. In order to show a breach of contract, the Plaintiffs must prove the following by a preponderance of the evidence:
>
> First, the existence of a contract between the Plaintiffs and the Defendant. And the parties have stipulated that a lease, which is a contract, did exist between Blakely and Murphy.
>
> Two, the Defendant's failure to perform an obligation contained in the contract; and
>
> Three, resulting damage to the Plaintiffs from the Defendant's failure. Now a lease, as I said, is a contract under the law. You will be given a copy of the various leases as with all of the other evidence in this case. It is up to you, based on the evidence, to determine what Defendant's obligations were under the leases that applied to this property and whether the Defendant fulfilled them.
>
> The lease allows the Defendant to put the property to a reasonable use. Reasonable use is that which an ordinary reasonable business, like the defendant, would use when conducting its operations. The measure of damages for the breach of a contract is the sum that would place the injured party in the same condition as if the contract had not been breached.
>
> In general, damages recoverable for breach of contract are those which result naturally and proximately from the breach and such as the parties should have contemplated when the contract was made.

With respect to Blakely Corporation's claim for punitive damages, the jury was instructed that it could assess punitive dam-

ages if it found by clear and convincing evidence that Murphy Oil's trespass on the land was "accompanied by circumstances of either fraud and malice or oppression." The jury was further instructed on the meaning of the terms "fraud," "malice," and "oppression" under Alabama law.

In its answers to interrogatories, the Alabama jury found that Murphy Oil had breached its lease with the Blakely Corporation and that Murphy Oil's "actions in breach of the lease" had caused the contamination on the island. The jury awarded $3.4 million in compensatory damages on the breach-of-lease claim. The interrogatories did not require the jury to identify, and thus the jury did not so identify, the particular obligation contained in the lease that was breached by Murphy Oil. The jury further found that Murphy Oil had committed a trespass against the Blakely Corporation but assessed no compensatory damages for the trespass. The jury determined, however, that the trespass had been accompanied by "malice, fraud, or oppression," and, on that basis as apparently permitted by Alabama law, awarded Blakely Corporation $4.6 million in punitive damages.

The District Court later conducted a hearing on Murphy Oil's posttrial motion to reduce or eliminate the award of punitive damages. The District Court found that the jury could have determined from the evidence that Murphy Oil had attempted to conceal the contamination from the Blakely Corporation in order to avoid responsibility for the clean-up costs. The District Court also stressed that the award of punitive damages was not related to Murphy Oil's negligent acts in causing the contamination in the first instance but, instead, was related to its intentional decision to leave the contamination in the ground and conceal it from the Blakely Corporation. The District Court concluded that the evidence was thus sufficient to support the finding of "malice, fraud, or oppression," but it reduced the award of punitive damages from $4.6 million to $2 million. Thus, the final judgment in the Alabama case was for $5.4 million. After an unsuccessful appeal to the United States Court of Appeals for the Eleventh Circuit, Murphy Oil satisfied the judgment, with interest, by depositing approximately $5.8 million with the District Court.

Murphy Oil then filed suit in the Union County Circuit Court against its insurance carriers seeking a declaration that the carriers were obligated under the CGL policies to indemnify Murphy Oil for the Alabama judgment. Early in the Union County proceedings, the Trial Court determined that the only insurance policies that had been "triggered" — *i.e.,* the policies that were potentially "on the hook" for the Alabama judgment — were those in effect when the three "major spills" occurred in 1970, 1975, and 1982. Thus, the Trial Court ruled that the only policies that would potentially afford coverage were the ESLIC policy, which was in effect at the time of the 1970 spill; the Unigard policy, which was in effect at the time of the 1975 spill; and the Associated policy, which was in effect at the time of the 1982 spill. Lloyd's and Century were dismissed from the case on motions for summary judgment, as the Trial Court determined that no major spill and accompanying "injury in fact" had occurred during the period of the Lloyd's policy (1961-69) or the period of the Century policy (1984-86).

Murphy Oil asserted that it was entitled to indemnification under the policies' various coverage clauses. The coverage clause in the Unigard policy provides in part as follows:

> The company hereby agrees . . . to indemnify the Assured for all sums the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law . . . for damages . . . on account of . . . property damage . . . caused by or arising out of each occurrence happening anywhere in the world.
>
> The term "Property Damage" wherever used herein shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the named assured).
>
> The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage . . . during the policy period.

Similarly, the ESLIC policy provides in part that ESLIC will indemnify Murphy Oil "for all sums" that Murphy Oil "shall be obligated to pay by reason of the liability imposed upon him by law . . . for damages . . . because of . . . property damage" which damages "are paid as a consequence of any occurrence covered hereunder." The ESLIC policy defines property damage as

"physical injury to, or physical destruction of, tangible property, including the loss of use thereof." Under the ESLIC policy, the term "occurrence" means "(a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in . . . property damage . . . neither expected nor intended from the standpoint of the Insured."

Finally, the coverage clause in the Associated policy provides in part that Associated will indemnify Murphy Oil

> for all sums which the insured shall be legally obligated to pay as damages . . . on account of property damage to which this policy applies, caused by or arising out of an occurrence happening anywhere in the world. . . .
>
> * * *
>
> The term damages includes damages for death and for care and loss of services resulting from personal injury and damages for loss of use of property resulting from property damage.
>
> The term "occurrence" wherever used herein shall mean an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly or unintentionally results in personal injury, property damage or advertising liability during the policy period.
>
> The term "property damage" means injury to or destruction of tangible property including loss of use thereof or resulting therefrom.

Thus, the coverage clauses in the policies issued by Unigard, ESLIC, and Associated are essentially identical.

In connection with their motions for summary judgment and motions for directed verdict, Unigard, ESLIC, and Associated argued that their policies, as a matter of law, did not cover the liability that Murphy Oil incurred in the underlying Alabama suit because that liability did not arise from any "property damage" within the meaning of the policies. They argued that Murphy Oil's liability for compensatory and punitive damages arose only from its breach of its lease with the Blakely Corporation and its "malicious, fraudulent, and oppressive" conduct in concealing the contamination from the Blakely Corporation. The insurance carriers asserted that liability arising from such actions simply was not covered by the policies. These motions were denied by the Trial Court.

■ We agree with the insurance carriers that their motions for directed verdict on the issue of coverage should have been granted. It is clear to us that, as a matter of law, no policy in this case afforded coverage for the type of liability incurred by Murphy Oil in the underlying Alabama suit.

■ The provisions of an insurance contract "are to be interpreted by the court in the plain and ordinary meaning of the terms and cannot be construed to contain a different meaning." *Horn v. Imperial Cas. & Indem. Co.*, 5 Ark. App. 277, 278-79, 636 S.W.2d 302, 303 (1982), *citing Southern Farm Bureau Cas. Ins. Co. v. Williams*, 260 Ark. 659, 543 S.W.2d 467 (1976). "This court has said many times that words in a contract must be given their obvious meaning." *Miller v. Dyer*, 243 Ark. 981, 984, 423 S.W.2d 275, 277 (1968). Thus, when an insurance contract is unambiguous, "its construction is a question of law for the court." *Hartford Fire Ins. Co. v. Carolina Cas. Ins.*, 52 Ark. App. 35, 39-40, 914 S.W.2d 324, 326 (1996). *See National Life & Accident Ins. Co. v. Abbott*, 248 Ark. 1115, 1117, 455 S.W.2d 120, 122 (1970)(stating "when policy language is clear and unambiguous, the court should decide, as a matter of law, the construction."); *Travelers Protective Ass'n v. Sherry*, 192 Ark. 753, 757, 94 S.W.2d 713, 715 (1936).

■ "The terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." *Southern Farm Bureau Cas. Ins. Co. v. Williams*, 260 Ark. 659, 664, 543 S.W.2d 467, 470 (1976). *See Hartford Fire Ins. Co. v. Carolina Cas. Ins.*, *supra*. Although we construe ambiguous provisions in favor of the insured, the issue whether a contract is ambiguous is a question of law for the court to resolve, *id.; Nationwide Mut. Ins. Co. v. Worthey*, 314 Ark. 185, 192, 861 S.W.2d 307, 310 (1993), and an ambiguity will be found "only when a provision is susceptible to more than one *reasonable* interpretation." *State Farm Fire & Casualty Co. v. Midgett*, 319 Ark. 435, 438, 892 S.W.2d 469, 471 (1995)(citations omitted) (emphasis added). As Justice George Rose Smith once put it, "[a]n insurance contract is to be construed strictly against the insurer; but where the language is unambiguous, and only one reasonable interpretation is possible, it is

the duty of the courts to give effect to the plain wording of the policy." *Ingram v. Life Ins. Co. of Georgia*, 234 Ark. 771, 773, 354 S.W.2d 549, 550 (1962).

Under the policy provisions quoted above, Murphy Oil was entitled to coverage only if it can be said that the damages awarded by the Alabama jury were "sums" that Murphy Oil became "legally obligated" to pay "as damages" "because of," or "on account of," "property damage" that was caused by, or arose out of, an "occurrence," which is essentially defined as an accidental event. The coverage question thus turns on the nature or type of liability that Murphy Oil incurred in the underlying Alabama suit. If the underlying liability was for damages imposed "on account of" or "because of" accidentally caused "property damage," then there is potential coverage under the policies. If the underlying liability was for damages imposed for some other reason, then there is no potential coverage.

We agree with the insurance carriers that the damages awarded by the Alabama jury did not represent "sums" that Murphy Oil became "legally obligated" to pay "on account of" or "because of" any "property damage." Under the unambiguous coverage provisions, then, Murphy Oil was not entitled to indemnification from its insurance carriers.

It is obvious to us that the Alabama jury, considering the instructions it received from the District Court and its answers to the interrogatories, made the award for compensatory damages "on account of" or "because of" Murphy Oil's breach of its lease, not on account of any property damage that resulted from Murphy Oil's operations on the island. The basis of Murphy Oil's liability for compensatory damages was simply its failure to honor its covenant to "quit and surrender the premises hereby demised in as good state and condition as reasonable usage thereof will permit." Murphy Oil's liability for compensatory damages, therefore, did not arise from conduct on the part of Murphy Oil that injured or damaged any property. The case would arguably be different, of course, had the jury based its award of compensatory damages on the negligence claim originally brought by the Blakely Corporation. As mentioned, however, that claim was dismissed under the statute of limitations and never reached the jury.

According to the dissenting opinion, Murphy Oil's discharge of petroleum onto the property constituted "one basis" for the jury's award of compensatory damages on the breach-of-lease claim. Having noted the instruction given by the District Court on the concept of "reasonable use," the dissent goes on to suggest that the damages assessed for the breach of the lease were based on Murphy Oil's "damage to the land" or its "failure to put the property to a reasonable use." Based on that analysis, the dissent concludes that the jury's award for compensatory damages was, in essence, an award based on "property damage" within the meaning of the policies' coverage provisions.

A careful reading of the leases that were submitted to the jury and the jury instructions given by the District Court reveals the flaws in the dissent's reasoning.

Considering the terms of the lease, the jury could not have found a breach, and thus could not have assessed compensatory damages, based solely on a petroleum spill or any other potentially "unreasonable use." The obligation incurred by Murphy Oil in the lease was not "to put the property to a reasonable use," as the dissent seems to suggest. Rather, Murphy Oil covenanted to surrender, at the conclusion of the lease term, the premises to the Blakely Corporation in as good a state and condition—as permitted by "reasonable usage" of the premises—as the premises were in at the beginning of the lease term. Thus, the "reasonable use" language cited by the dissent did not impose on Murphy Oil a separate obligation that the jury could have found to have been breached. This language merely guided the jury in evaluating the condition of the property at the conclusion of the lease term.

Certainly, the jury instruction mentioned by the dissent could not have permitted the jury to assess compensatory damages for a breach of the lease based solely on a "failure to put the property to a reasonable use." The instructions, which, as abstracted, are quoted above, merely defined the concept of "reasonable use" and informed the jury that the lease permitted Murphy Oil "to put the property to a reasonable use." Again, this instruction guided the jury in determining whether Murphy Oil had surrendered the premises in as good a state and condition as the premises had been in at the beginning of the lease term. The jury would

have been permitted by this instruction to find in Murphy Oil's favor on that issue if it determined that the less-than-perfect condition of the property at the conclusion of the lease term was attributable to "reasonable use." The instruction did not, however, permit the jury to find a breach of the lease, and to award compensatory damages, based only on "unreasonable use" of the property.

The record thus clearly establishes that the Alabama jury's award for compensatory damages was based on a finding that Murphy Oil failed to restore the leased premises to the condition that they were in at the beginning of the lease term. This was the only "breach" that the Alabama jury could have found in light of the provisions of the lease agreement and the instructions given by the District Court. Only by revising what actually occurred in the Alabama trial can one conclude, as the dissent does, that the jury found a breach of the lease based solely on Murphy Oil's "discharge of petroleum," its "damage to the land," or any other "failure to put the property to a reasonable use." Thus, the dissent's attempt to classify the jury's award of compensatory damages as one made "because of" or "on account of" "property damage" is unavailing.

█ In any event, regardless of the particular act or omission found by the jury to have constituted a breach of the lease, we stress that the Alabama jury was instructed that any award of damages it made on the breach-of-lease claim would constitute "damages for breach of a contract" and that such an award should reflect "the sum that would place the injured party in the same condition as if the contract had not been breached." The jury awarded $3.4 million in compensatory damages on the breach-of-lease claim after hearing expert testimony to the effect that the contamination could be removed from the island for that amount. In light of the instructions given to the jury by the District Court, the award of $3.4 million constitutes "contract damages," rather than damages awarded "because of property damage," as it is the amount that was necessary to place the Blakely Corporation in the position it would have occupied had Murphy Oil honored its obligations under the lease agreement. The unambiguous policies issued by the insurance carriers simply afford no coverage for contract damages.

■ Likewise, the punitive damages imposed by the Alabama jury were not "sums" that Murphy Oil became legally obligated to pay on account of, or because of, any accidentally caused property damage. The record from the Alabama trial leaves no doubt that the punitive damages were awarded solely on account of Murphy Oil's intentional conduct, labeled "malicious, fraudulent, or oppressive" by the Alabama jury, in failing to remove the contaminants from the island before vacating the premises and in concealing the contamination from the Blakely Corporation. Again, "property damage" was not the basis of Murphy Oil's liability for punitive damages; thus, there is no coverage for that aspect of Murphy Oil's liability under the policies at issue in this case.

We have uncovered no case with facts exactly like those now before us. In *Braswell v. Faircloth*, 387 S.E.2d 707 (S.C. App. 1989), a chemical spill much like the spills in this case was held to be an "occurrence" resulting in "property damage" as described in a policy like those at issue here. The insurer was held to be liable to indemnify the lessee of the land for damages assessed against the lessor-owner by environmental agencies. The lessor had prevailed against the lessee in a breach-of-lease action. There is a glaring distinction between the *Braswell* case and this one. Here we have a claim for indemnity for damages assessed in a federal court proceeding in which it was held that, because the statute of limitations had run, the lessee was not liable for its negligence resulting in the "accidents" or "occurrences" which, in turn, resulted in "property damage." Rather, the lessee, Murphy Oil, was liable for breach of the lease contract, an event not covered by the policies. Moreover, the *Braswell* case did not expressly consider the question now before us — that is, whether damages awarded for breach of lease qualify as damages awarded "because of" or "on account of" "property damage." Rather, it held that the spill of the chemicals on the lessor's land was the "occurrence" that qualified for coverage under the insurance policy. No doubt there was an "occurrence" in this case too, but Murphy Oil was absolved of liability for it due to the running of the statute of limitations. Surely the insurers cannot be held liable for events for which their insured is not liable.

We find a better analogy between this case and others in which courts have denied coverage under similar language in CGL policies where the insured was held liable in the underlying suit on theories of fraud or misrepresentation.

In *Safeco Ins. Co. of America v. Andrews*, 915 F.2d 500 (9th Cir. 1990), the seller of certain real property, Mr. Andrews, was sued by the buyer, Ms. Kuehl, for negligent failure to inspect the property, misrepresentation, breach of contract, and rescission of contract. Mr. Andrews tendered his defense to his insurance carrier, and the carrier sought a declaration that it had no duty to defend. The United States Court of Appeals for the Ninth Circuit held in favor of the insurance carrier and said that the claims for misrepresentation and failure to inspect

> do not expose Andrews to liability for any damage to tangible property, but rather for economic loss resulting from Andrews's alleged failure to discover and disclose facts relevant to the property's value and desirability. Such harm is outside the scope of the policy. Although the defective condition of the property is an element of Kuehl's claims, the defects cannot, even when interpreting the policy broadly, be considered the *cause* of Kuehl's damages.

*Id.* at 502 (citations omitted).

Here, as in the *Safeco* case, "property damage" was, in an abstract sense, an "element" of the claim for which the insured was ultimately held liable in the underlying case. That fact does not, however, mean that the liability imposed on Murphy Oil by the Alabama jury was "on account of" or "because of" property damage. That the facts in the underlying case involved "property damage" "does not change the nature of the claim" that was asserted by the Blakely Corporation, which was a breach-of-lease claim, "[n]or does it change the risks the policy insured against." *Qualman v. Bruckmoser*, 471 N.W.2d 282, 285 (Wis.App. 1991). The liability incurred by Murphy Oil in the underlying Alabama suit represented the "economic loss" that the Blakely Corporation suffered on account of Murphy Oil's breach, and such losses simply are not covered by the language of the policies Murphy Oil purchased from its insurance carriers. *See also Allstate Ins. Co. v. Miller*, 743 F. Supp. 723, 726 (N.D. Cal. 1990) (stating "economic

or contractual losses" are "outside the meaning of 'property damages' under the policy"); *SCA Disposal Servs. of New England, Inc. v. Central Nat'l Ins. Co.*, 2 Mass.L.Rptr. 44 (1994 WL 879689) (Mass.Super., April 12, 1994) ("Losses caused by the insured's alleged negligent misrepresentation or breach of lease are not 'damages because of . . . property damage caused by an occurrence' covered by a liability policy.") (citations omitted).

In the cases discussed above, the insureds would not have incurred liability "but for" certain "property damage." Nonetheless, the courts rejected the insureds' assertions that coverage was available. Even though the insureds in those cases may not have been charged with causing the property damage that was at issue (as Murphy Oil was in the instant case), those cases support our rejection of Murphy Oil's broad contention that coverage is available to an insured under a CGL policy as long as "property damage" is merely lurking somewhere in the underlying case. We reiterate that, whether or not Murphy Oil caused property damage, it sought indemnification for damages that were assessed against it for breach of its lease. Neither those damages nor the punitive damages assessed for trespass fall within the coverage provisions of any of the insurance policies under consideration.

In summary, we take the following action on the direct appeal and cross-appeals raised by the parties. In light of our holding that the CGL policies issued by Unigard and ESLIC afford no coverage to Murphy Oil as a matter of law, we reverse the judgment against Unigard and ESLIC and dismiss. Murphy Oil's cross-appeal against Unigard and ESLIC, which concerns the Trial Court's calculation of prejudgment interest, is therefore moot.

We also affirm on Murphy Oil's contingent cross-appeal against Associated. That cross-appeal is from the Trial Court's order denying Murphy Oil's motion for new trial, which in turn was premised on evidentiary rulings that Murphy Oil believed to be erroneous. Even if we believed the denial of the new-trial motion was error, which we do not, we would not reverse in light of our holding that Associated's policy, as a matter of law, does not cover Murphy Oil's liability. As we affirm on Murphy Oil's contingent cross-appeal against Associated, the contingent cross-appeal brought by Associated against Murphy Oil is moot.

Finally, we affirm the contingent cross-appeals taken by Murphy Oil against Century and Lloyd's. Murphy Oil asserts that the order granting summary judgment to Century and Lloyd's should be vacated in the event we rule in favor of the other insurance carriers. We disagree. Century and Lloyd's were granted summary judgment on the basis of the Trial Court's ruling that the only policies "triggered" in this case were those in effect during the years that the three "major spills" occurred. The only way that Century and Lloyd's could be brought back into the case is if the Trial Court's ruling on the "trigger" issue were reversed. As no party has challenged the Trial Court's trigger ruling, we are in no position to reverse it. Even if we could do so, however, the fact remains that Murphy Oil's liability in the underlying Alabama suit was not for "property damage" caused by any "occurrence" that happened during the period that the Century and Lloyd's policies were in effect. That is an additional reason for affirming on Murphy Oil's contingent cross-appeals as to Century and Lloyd's. As we affirm on Murphy Oil's contingent cross-appeal against Century, the contingent cross-appeal brought by Century against Murphy Oil is moot.

Reversed and dismissed.

Special Justices ODELL POLLARD and KEITH RUTLEDGE join in this opinion.

BROWN, J., concurs in part and dissents in part.

GLAZE and CORBIN, JJ., not participating.

ROBERT L. BROWN, Justice, concurring in part; dissenting in part. I agree that the punitive-damage award of $2 million must be reversed and dismissed for the reasons stated in the majority opinion. To conclude, however, that the breach-of-lease award by the Alabama jury in the amount of $3.4 million was not due to property damage caused by two petroleum spills and, thus, was not covered by the ESLIC and Unigard policies is logically unsound and does not comport with the facts of this case.[1] I dissent from

---

[1] The ESLIC and Unigard policies were for excess coverage. USF&G, which carried the basic coverage, paid Murphy Oil the policy limits.

that part of the majority opinion denying coverage for damages caused by breach of the lease agreement.

The ESLIC policy which was in effect at the time of the 1970 petroleum spill indemnified Murphy Oil *for all sums* that the insured was obligated to pay due to property damage caused by an accident. The Unigard policy in effect during the 1975 spill had similar language.

Murphy Oil was sued by Blakely Corporation in federal district court in Alabama in 1990 on alternative theories, which included (1) negligence for failure to use reasonable care to prevent the discharge of petroleum on the Blakely land, and (2) breach of the lease agreement for operating the facilities so as to allow petroleum to be discharged on the property and for failing to surrender the premises to Blakely in the same condition the land was in when the lease began. The gravamen of both counts was damage to the property caused by the petroleum spills. The negligence count was dismissed based on a limitations defense, and the majority correctly acknowledges that a jury award for negligence might have generated liability under the two policies.

Somehow, however, the majority concludes that the "contract damages" award by the Alabama jury for breach of the lease had no relationship to the "property damages" caused by the petroleum spills. The unsoundness of this conclusion is made manifest by the simple fact that without the property damages there would have been no "contract damages." Blakely sued for damages resulting from discharge of petroleum on its property as one basis for breach of the lease, and the jury was instructed that the lease required that the leased property be put to a reasonable use, which an ordinary reasonable business would use when conducting its operations. Damage to its land was the very essence of Blakely's complaint.

The two policies provided indemnity for *all sums* Murphy Oil was required to pay due to accidental property damage. We interpret insurance contracts according to their plain and unambiguous language and in favor of the insured. *Smith v. Shelter Mut. Ins. Co.*, 327 Ark. 208, 937 S.W.2d 180 (1997); *Nationwide Mut. Ins. Co. v. Worthey*, 314 Ark. 185, 861 S.W.2d 307 (1993). What could be clearer than the language in the two insurance contracts?

At a minimum, the lease agreement on this point is ambiguous. When the terms of an insurance contract are ambiguous, we accept an interpretation favorable to the insured. *Nationwide Mut. Ins. Co. v. Worthey, supra; Drummond Citizens Ins. Co. v. Sergeant,* 266 Ark. 611, 588 S.W.2d 419 (1979). Yet, inexplicably, the majority refrains from finding any connection between the petroleum spills and the breach of the lease agreement. In doing so, the majority concludes that Murphy Oil's interpretation of its contract as well as that of the trial court are not reasonable constructions of the contract.

More seriously, the majority opinion fails to distinguish successfully the one decision that has confronted this issue and held in favor of the insured. *See Braswell v. Faircloth,* 387 S.E.2d 707 (S.C. App. 1989). In *Braswell,* the lessor of land sued its lessee and the liability carrier for the lessee for damage to the land caused by a chemical spill after the lease terminated. The trial court ruled the chemical spill was not an "occurrence" under the lease because it was not accidental but rather a deliberate failure to remove hazardous waste. The Court of Appeals reversed and focused on the accident and property damage. In doing so, the appellate court held that an "occurrence" under the policy took place and the carrier was liable.

As was the case in *Braswell,* the proper focus for the breach-of-lease claim should be on the accidental nature of the property damage and whether this constituted an "occurrence" for purposes of the ESLIC and Unigard policies. Just as in *Braswell,* Murphy Oil was required to compensate Blakely due to damage to its property, and just as in *Braswell,* the lessee's carriers should be responsible for these damages. The majority opinion fails to acknowledge that accidental property damage lies at the core of this litigation and erroneously concludes that the appellate court's rationale in *Braswell* does not rise to the level of legitimacy for ambiguity purposes. The majority opinion, in addition, appears to shift gears in its discussion of *Braswell* and concludes that the statute of limitations is the true distinguishing factor. Of course, limitations was not an issue in *Braswell,* and there is no question but that the breach-of-lease claim was timely filed and was directly tied to the accidental chemical spills in the case before us. Regardless of the label placed on the cause of action, whether it be

for negligence or breach of lease, the liability imposed on Murphy Oil came about as the result of "occurrences" during the terms of the ESLIC and Unigard policies.

The majority next erroneously analogizes cases involving misrepresentation by an insured to the instant case where the underlying compensatory damages awarded were for breach of contract which were tied directly to property damage. *See, e.g., Safeco Ins. Co. of America v. Andrews,* 915 F.2d 500 (9th Cir. 1990). I agree that misrepresentation is not a covered occurrence for accidental property damage. But misrepresentation was not the basis for the $3.4 million award in Alabama. Damages were assessed for breach of the lease and for failure to put the property to a reasonable use. The punitive damages, no doubt, were attributed to misrepresentation, and, again, I agree they were not covered by the policies. But the compensatory damages awarded were separate from the punitive damages and were occasioned solely by *the damage to the property*.

It is surreal to contend that property damage was merely "lurking somewhere in the underlying case," as the majority opinion puts it. The petroleum spills lay at the heart of the Alabama case, as can be readily gleaned from reading the complaint in that action.

In sum, the majority confuses a jury verdict based on damage to the land and then turning it over in a damaged condition, all of which breached the lease, with a verdict for fraud and misrepresentation based on hiding the fact that the land had been damaged. The jury awarded $3.4 million in damages based solely on breach of the lease. I fail to see why the two carriers should not be liable for the accidental spills which occurred while their contracts were in force. To hold otherwise is an interpretive stretch and etches in our caselaw a precedent that undermines favorable construction of insurance policies for insureds.

Because I disagree with the majority on this fundamental issue, there is no need to address the remaining points raised.